Good morning. Good morning, your honors. I'm Paul Fogel, representing the appellant United States Surgical. This case involves a challenge to a future lost-profits award of $1 million on a requirements contract that was both breached and repudiated. We are not challenging either the breach of contract damages or the incidental damages award, somewhere about 240,000 at each. We are challenging the $1 million future profits award because there was no evidence to support a finding that United States Surgical sold its spine business to Stryker in bad faith to try to evade its requirements under the contract. You say there's no evidence. Do I understand correctly you did not make a motion for judgment as a matter of law at the close of all the evidence? That is correct, your honor. Doesn't that cook your goose? I don't think so, because there are several you look at the first of all, you know the district judge reached the issue, reached the merits. And that this Court reviews that decision for abuse of discretion under the Gilbrook case. Now, in the Farley case, this Court said, although 50A, the 50A requirement is a strict one, the Court is, quote, more liberal about what constitutes a Rule 50A motion. And it said, it points to several examples, objection to an instruction. A motion in limine can be an inartful, not made 50A motion that would permit the Court to reach the merits of whether there's substantial evidence. We made objections to Byron's instructions on future loss profits. Instruction 44, we've made an objection at 1007 of the record. We objected to its loss profits instruction, which said nothing about a good-faith sale of a business. We proffered our own instruction that said the good-faith sale of a business is not – is a ground for precluding a loss profits award, and that instruction was objected – refused, sorry. The gist of the matter is that if Byron and the Court are on notice that we don't believe there's any evidence of bad faith, we don't believe there's any basis for a future loss profits award on that basis, then there's no surprise, then there's no reason to invoke this somewhat harsh rule, which is a reason why the Ninth Circuit precedent, though, quite strictly construes the procedural requirements under Rule 50. I agree. Farley and, I think, James v. Walmart are – they say substantial compliance isn't enough, the requirement that a motion be made at the close of all the evidence is to be strictly observed. There's a lot of language going against you. That is correct, Your Honor. But in Farley, if you go on, you'll see this passage. This Court is more liberal. Although the 50A requirement is a strict one, this Court's more liberal about what constitutes a 50A motion. And if you look at the cases cited, such as McLaren, Hearst, Lifshitz, you'll see in McLaren that it says an objection to an instruction for lack of sufficient evidence is a reasonable facsimile. I recognize that there was no 50A motion here. I think also, however, you need to look at the district courts reaching the – having reached the merits and apply the proper standard of review. Even if you put all of that aside and say we had no right to a JMOL because we didn't make a 50A motion, we still have the Patel decision, which says the failure to make a 50A motion precludes you from getting JMOL, but it does not preclude you from challenging the evidence on appeal on the ground that there was no evidence to support, in our case, a bad faith finding of a sale to Stryker. And we have discussed that case, the Patel case, in our brief, and we've also taken the third or second fallback position in that forget 50A, forget 50B, forget all that stuff, we move for a new trial on the basis of insufficient evidence, which is an accepted ground, and that doesn't require any sort of hint of a 50A motion. The point I'm making is the Court should, as Judge Carter did, the Court should reach the merits of whether there is some evidence to support a bad faith finding. Well, let me ask you this. Let's, you know, obviously when you look at evidence, the parties always seem to like to re-argue what was the better evidence, but let's, I do see evidence in the record that USS denied the existence of a valid contract with Byron. Correct. Exaggerated claims that Byron's deliveries were late. Correct. Simultaneously purchased Schedule A parts from B.W. and Byron in breach of the contract. Absolutely correct. Played a role in Perucci's recruitment by B.W. Correct. And repudiated the contract with Byron. Why isn't that evidence sufficient? Okay. Every single one of those things that you said we concede, because on the standard review, we concede. But look at what they are. None of them had to do anything with the sale to Stryker. Well, can we throw in one more thing? That USS sold SDI seven months after, all right, the lawsuit was initiated. Correct. Okay. Well, that's one other part of the evidence, isn't it? True. We sold the business for $135 million. How much you sold it for? The question is, why did you sell it? Did you sell it to get out from under this lawsuit and from out this possibilities? And that, you know, you start with that and bingo. Well. The air begins to smell. I beg to differ. I mean, we did disclose. If you look at Exhibit 231 at page 1188 of the excerpts of record is part of the contract between Stryker and the United States seal. We disclosed in that contract, we were involved in settlement negotiations with Byron, and we said to Stryker, if we settle this deal, if we settle this deal, we'll ensure that Byron is taken care of. Now, does that sound like bad faith, Your Honor? That's in black and white. That's not, we're not talking about squishy witnesses who get on the stand and start squirming. We're talking about black and white, you know, this is what we told Stryker. We'll take care of Byron if we, we'll take care of Byron. If we can settle with Byron, we'll make sure that Byron has a source for selling its parts. And then we'll enter into a deal with Stryker. But That's fine if that's the only piece of evidence that there was floating around. But there's more. But if I can get to Judge Callahan's point. Yeah. Judge Callahan, you bring up the point, we stole or we helped steal Mr. Perucci from the Byron company and had him go over to the B.W. company. That has nothing to do with the sale to Stryker. We denied the existence of a contract. We said those two letters, the May 25th one and the July 10 one, put them together. The jury found there was a contract. We denied there was a contract. Let's say that was bad faith. That's argument. That's argument. I'm hearing argument here. I'm just, that, there is no, there is evidence in the record that, that U.S.S. played a role in Perucci's recruitment. Because one of the people went and the whole thing. Absolutely. Now, there's two ways that you can look at it. You can look at it the way that you're just saying it. You can look at it the way that Byron. Absolutely. That twist. And so that just tells me, well, that's evidence. And the jury was free to do whatever they wanted. Evidence of what? It's an evidence of a breach of a contract. It's not evidence of bad faith sale to Stryker. It has nothing to do with the sale to Stryker. And as I said, when Byron asked for assurances by letter, tell us, assure us that we have a contract. We said, no, we don't have a contract. Let's assume that's in bad faith. What does that have to do with a sale to Stryker? The issue is, is the sale to Stryker in bad faith? Not, did we do bad faith with Perucci? Did we do bad faith in denying the existence of a contract? But you're just trying to say the fact that you denied that there was a contract is sort of like, you know, a person can plead not guilty to murder and they can still be guilty. That, you know, you can take a position, but, you know, that was all that the jury was hearing. I mean, the jury obviously decided there was a contract. And I think that the, Byron and Byron's lawyer did a very effective job in arguing a closing argument. Mushed all the bad faith together. If you look at his argument at 1042 to 1046, you'll see. He says, they were in bad faith for this, and they were in bad faith for that, and they were in bad faith for this. But the issue is bad faith sale. Did we sell to Stryker to evade our obligation under the contract? That's the very tiny little narrow issue. That's why we're only challenging the future lost profits award. We're not challenging the breach of contract award, which arises from all this other bad faith. We're not challenging the incidental expenses award, which arises from the repudiation. Let's say that was in bad faith. We're only challenging the future lost profits, and that turns on one single issue. Was the sale to Stryker in bad faith? We said, and I understand the jury could have disbelieved it, but there's no evidence to contradict what I'm about to say. We said, we sold that company. We sold the spine business to Stryker because we wanted to focus on our core business of laparoscopic instruments and wound closure devices. After all, we had bought that business five years before. It's not like we have 100 years of experience in it. We bought it from Smith and Nephew, I think it was the company, in 1997. Then we sold it in 2002 for $135 million. The point is you have to look at that and really focus, which is why we tried to focus this appeal on what we thought was wrong. Look what the district judge said. Remember what the district judge said when he rejected Byron 17200? He said, U.S. Surgical sold SDI, that's the spine business, to Stryker. Quote, after good faith, arms-length negotiations and exchange of consideration, he concluded, quote, the sale of SDI was for legitimate business purposes and was not for the purpose of evading the obligation to Byron, ER 73 to 74. Now, that was in the context of the 17200 claim, which was tried to the court. So you have a jury finding that is exactly 180 degrees south of there, and you have a court finding. I recognize it's not on these damages, it's on the 17200 claim. So you put that together, you mix it all together, and I say no reasonable juror could find that we acted in bad faith in selling the business to Stryker. You're over your time. We'll give you two minutes on rebuttal. Thank you. Good morning. David Ribicoff, appearing on behalf of plaintiff and appellee, the Byron Company. Can I ask you, I just want to jump to one area that we didn't cover. That in terms of the offset, I think counsel for Byron in opening statement said something about, well, yeah, there probably was some overpayment or something to that extent, but, well, and the jury came back that they weren't entitled to any offset. All right. Now, I recognize that opening statement is not evidence, but the fact that counsel went into it with that concept, what do we do with the offset verdict there? I submit, Your Honor, that you do exactly what the jury did and find that they, U.S. Surgical, did not satisfy its burden of proof on the issue, which it undeniably had. U.S. Surgical said in its opening and in its closing that we're entitled to the full $350,000-plus on our offset claim. At trial, when I cross-examined their expert witness on the issue, he conceded that there was a discrepancy between his factual assumptions on that specific issue and the evidence from their own witness, David Shumsky, who said these certain purchase orders should not be included in the new pricing scheme. So the jury was left to essentially guess as to what the offset damage was. And no clarification was ever made by U.S. Surgical, and even today they still contend that they're entitled to the entire $350,000-plus. So the jury was presented with conflicting evidence. They had no basis upon which to select one number versus another. And they were free, as they did, to find that U.S. Surgical simply didn't satisfy its burden of proof on the offset counterclaim. So even though you thought that you probably did owe something, they got their bite at the apple and they missed. Yes, Your Honor. That's the point. At trial, you have your opportunity to present your evidence to the jury. And if there's evidence to the contrary, you either concede that there's evidence to the contrary and deal with it, or you don't and you take your chances when presenting your case to the jury. And they may find against you, and that's precisely what they did here on the counterclaim. You answered my question. Thank you. Let me ask you one, Mr. Rivercroft. Mr. Fogel made the point that they didn't make a motion at the close of the evidence, but they objected to a jury instruction, which he says under our cases can be construed as a motion. What's your answer to that? My answer to that is this. On the jury instructions, they simply reserved their right on their objection. They made an objection without prejudice to what ultimately became the jury instructions, which, by the way, were stipulated to, all the jury instructions were stipulated to. So they did it without prejudice. But then they did not insist upon a ruling on their objection at any point in time. Likewise, they didn't insist upon a ruling on motion eliminating number nine. So there was never any ruling on either the objection or the motion. And so under the decisions that we cite, the Farley decision and the Jaynes decision, there was no equivalent to a Rule 50A motion. And therefore, there was no legitimate renewal motion under Rule 50A. And consequently, the standard of review on this appeal is manifest miscarriage of justice. It's your position that all of the charge was stipulated to the jury. All of the instructions were stipulated to? Yes, Your Honor. The instructions were stipulated to. And there was an objection to one instruction with a reservation of rights. However, there was no subsequent insistence upon a ruling on that objection. Okay. And so the instructions were all stipulated to. All right. The issue of the, quote, unquote, good faith sale. Judge Carter, in issuing his ruling denying the motion for new trial and motion for directed verdict, said that, yes, in the 17200 claim, I said that there was a good faith sale. But he also said this. The jury had evidence entitling it to make a contrary finding, which it did. And there is evidence in the record that they did not act in good faith vis-à-vis Byron. And the point that you made, Your Honor, was correct. The lawsuit was filed on the repudiation claim under the Uniform Commercial Code. We're entitled to future lost profits under 2710-2. After the lawsuit was filed, seven months down the road, they sell the business to Stryker. Well, that's not, that wasn't the basis upon which we sued them for repudiation in the first place. And they said, well, in the contract there's a mention of settlement discussions. The jury heard evidence, testimony, that the person from Stryker who was dealing with U.S. Surgical received a price sheet which didn't jive with Schedule A to the actual contract. He was looking at different pricing structures. U.S. Surgical wasn't telling the truth to Stryker when it sold the business. In fact, at the time, U.S. Surgical denied that the contract even existed. So how could U.S. Surgical have been found to have acted in good faith when it doesn't even concede the basic point that they had a contract with Byron? They not only had that contract with Byron, which U.S. Surgical now concedes, but the and U.S. Surgical did not even make a factual, truthful representation to Stryker regarding that. Also, it did not tell Stryker that there was any exclusivity provision in its contract with Byron. That was a key point. We had a contract that spanned four years for those specific part numbers, which was a very profitable contract. To say to Stryker, well, we're entering, we're in settlement discussions with them, is not the same thing as saying we have an exclusive four-year contract with them for very specific prices on very specific part numbers. Those two are very different. And the jury heard that evidence, and it was entitled to find that U.S. Surgical was not acting in good faith. The jury heard instructions defining good faith as meaning honesty in fact. That was dishonest conduct in dealing with Stryker. So the jury did have evidence to find that there was no good faith. And the jury likewise did have evidence to make its determination of lost profits. As we point out in the brief, there were two ways of skinning the cat, at least two ways. They say that the jury found that we were entitled to incidental damages and then just tacked on another million dollars. Well, there is nothing in the jury verdict to suggest that. There is no separate finding of incidental damages. And we submit that the jury could have looked at it that way or it could have looked at it another way, the way that we suggest, which is take their expert's number based on their own forecast document and extrapolate based upon the profit margins that our expert testified to. And if you come out with a number, it's almost identical. And the purpose of that exercise was to show that the jury did its job in deliberating. And this Court, in determining whether the jury did its job, has an obligation under the law to harmonize any inconsistencies. U.S. Surgical is submitting that this Court do the exact opposite, that it find in its favor that any inconsistency be construed in its favor, that even the facts, Your Honor, be construed in its favor. And you mentioned the issue of Gino Carucci and other elements of bad faith. Under any standard, under the Manifest Miscarriage of Justice standard, under the Substantial Evidence standard, we submit that this judgment upon the jury verdict should be affirmed. Thank you, Your Honor. Roberts. Thank you, Mr. Ribicoff. Mr. Fogel, you get the last word. You've got two minutes. Thank you. I would ask you to look at ER 1003 through 1009. I'm sorry, what was it? 1003 to 1009. That's the conference on instructions. At 1004, after we have objected to instruction number 31 and explained why, the Court rules. The Court finds language in number 7, that was our instruction that we proffered, concerning factual language, blah, blah, blah, is unnecessarily confusing, so the Court has modified this variation and then says, all right, regardless of the initial objection that we raised, is this modified condition or is this modified instruction acceptable without waiving any of the prior objections on behalf of the defense? Ms. Blum, my colleague, as of now modified without waiving, yes, Your Honor. Page 1009, that's when there's a discussion about our objection to instruction number 44, which was an instruction that doesn't have anything about the sale of a business It just says, if they repudiate, they get damages if they're proximally caused. We objected to that because it didn't factor in this idea of a good-faith sale of a business. The Court rules 45 will be given as is. I don't see how that's a waiver. After a long call of duty. What was your objection to 45?  This is a determination of future lost profits and when it may be recoverable. We offered special instruction 17 that we believe were. How can that be construed as an objection to the sufficiency of the evidence? No. If you look at the instruction, Your Honor, their instruction, it has nothing in there about bad faith or good faith. It just says, we get future lost profits if they repudiate it and the damages are proximally caused. I'm sorry, we're talking, we're not connecting. Your point was, we didn't make a motion for judgment as a matter of law at the close of the evidence, but we made an objection to an instruction that was tantamount to the same thing. If you just read, I don't understand how that can be construed as an objection to the sufficiency of the evidence. Because the instruction they wanted and got had nothing in there about good faith or bad faith sale. So, how is that? Well, they're saying they get future lost profits irrespective of whether there's good faith or bad faith. And our point is, there's a good faith overlay to all of this and we want that in the instructions. That's not the same as saying there's no evidence of. It's not. We did not utter the precise words. There is no evidence to support that. We did that in the motion in limine. Okay? Which is another basis for getting by 50A, the 50A requirement. Thanks. One more. Well, you're out of time. 30 seconds. 30 seconds. Judge Palahan, you asked about the offset. If you look at the four exhibits, some of them have to do with parts shipped after, parts ordered after July 10, 2000. I ask you to look at ER 1063-66 and 1110-13 and 1114-38. Or if you want a nice summary, our reply brief has it all. The point is, those exhibits, some of them were indisputably, they didn't involve parts ordered or shipped before July 10. So, they necessarily were entitled to the discounted prices and therefore some offset. Thank you. The case just argued is submitted.
judges: Silverman, Callahan, Duffy